## GRAVES, PLAINTIFF IN ERROR, v. THE PEOPLE OF THE STATE OF COLORADO, DEFENDANTS IN ERROR.

1. CRIMINAL TRIALS.   DUTY OF COURT.

In a criminal case it is the duty of the court to see that the trial is conducted according to law, and the jury properly instructed.

2. HEARSAY EVIDENCE.

Hearsay evidence is generally inadmissible, but to this well established rule there are some exceptions.

3. STATEMENTS OF THE DECEASED IN HOMICIDE CASES.

In a trial for murder by poisoning, the statements of the deceased in narration of past events, voicing her suspicions as to the sender of the poison, are incompetent.

4. DYING DECLARATIONS.

Where it is shown that the deceased at the time of making certain statements expected to recover, such statements are not receivable in evidence as dying declarations.

5. RES GESTÆ.

*Res gestæ* are events speaking for themselves through the instinctive words and acts of participants, not the words and acts of participants when narrating the events.

6. OBJECTIONS TO IMPROPER EVIDENCE.   WHEN SUFFICIENTLY MADE.

Where the record shows that at the time a certain class of evidence was first offered its admission was vigorously opposed, the objections to its introduction then fully argued and renewed upon a motion to strike out, held sufficient to reserve the point, without a renewal of the objection to each question thereafter propounded.

7. CIRCUMSTANTIAL EVIDENCE.   LINK IN CHAIN OF.

Where the evidence in a criminal case is wholly circumstantial, it is error to instruct the jury that they need not be satisfied beyond a reasonable doubt of each link in the chain of circumstances relied upon to establish the defendant's guilt.

*Error to the District Court of Arapahoe County.*

Messrs. WELLS, McNEAL & FURMAN, for plaintiff in error.

Mr. J. H. MAUPIN, attorney general, Mr. J. B. BELFORD, Mr. LAFE PENCE and Mr. I. N. STEVENS, for defendants in error.

CHIEF JUSTICE HAYT delivered the opinion of the court.

Josephine A. Barnaby died in the city of Denver upon the 19th day of April, 1891, under circumstances indicating that her death was caused by arsenical poisoning. Plaintiff in error, T. Thatcher Graves, was indicted for the murder of the deceased, convicted of murder in the first degree, and sentenced accordingly.

Mrs. Barnaby at the time of taking the supposed poison, which the evidence indicated produced death, was stopping temporarily with friends in the city of Denver. She had immediately prior to this been traveling in the state of California, and was then on her return to her home in the city of Providence, in the state of Rhode Island.

The plaintiff in error, a practicing physician in the city of Providence, was the confidential friend of the deceased, and for some time previous to her death had the entire control and management of her estate, amounting in the aggregate to something over $100,000. The major portion of this property is shown to have consisted of stocks and bonds, standing at the time in the name of plaintiff in error.

He had never been required to give security for this property and none was given. The testimony shows that, at least up to a period shortly before her death, the deceased had held the defendant and his family in the highest esteem as friends, and that she had unbounded confidence in his business sagacity and integrity. She had been for years a sufferer from partial paralysis of one side of her body, plaintiff in error being her sole attending physician. When at home in Providence, she was often a visitor in his family, and while traveling was in the habit of writing him upon business and other matters frequently. Her letters introduced in evidence are couched in language breathing a spirit of respectful regard and concern for Dr. Graves and his family, which consisted of a wife and his aged mother. Her regard for this convicted man is further shown by two wills introduced in evidence,

in each of which he is left a legacy of $25,000, and made her sole executor without bonds.

In general, Dr. Graves' letters to Mrs. Barnaby are of like character as those from her to him, although two, written at a time when she was contemplating the purchase of property in the Adirondack mountains, and for the purpose of preventing such investment, are of a different nature. A favorite resort of Mrs. Barnaby in the Adirondack mountains of New York was sometimes called "The Woods." It was under the management of her friends referred to by the witnesses as the "Bennetts." It was near this place that she proposed to invest. In the two letters mentioned Dr. Graves stated that the executors of her late husband's estate were much displeased with her conduct, and would take steps to have a guardian appointed for her, if she persisted in her intention to purchase. He admitted, upon cross-examination, that he knew at the time of writing these letters that some of the statements therein made were unfounded and false.

Gain is ascribed as the motive for the crime. It is claimed that Dr. Graves had squandered a portion of Mrs. Barnaby's estate, and was apprehensive lest his agency might be revoked and an accounting demanded; that he desired her death so that detection would be improbable, and also that he might thereby come into possession of the benefits conferred upon him by her will.

The circumstances surrounding the fatal illness of the deceased, in brief, are as follows:

In Denver, she was the guest of Mr. and Mrs. Worrell. Shortly before her arrival in this city a package came by mail to her address. It was directed in care of Mr. Worrell and taken from the post office to his office. This package was deposited on the top of a desk in a down town office occupied by Mr. Worrell and others, and there allowed to remain for several days.

Upon Mrs. Barnaby's arrival Mr. Worrell put the package in his buggy for the purpose of taking it up to his residence. It was, however, forgotten, and taken with the buggy to the

livery stable, where it remained for a brief period. It was then found and given to Mr. Worrell, and by him in turn handed to the deceased. It appears that this package was opened by Mrs. Barnaby in the presence of several parties, before it was removed from the down town office. It contained a bottle of sufficient capacity to hold about one half pint, filled with a dark fluid which some of those present took to be blackberry wine. This bottle, although not mailed until the latter part of March, and not received until some time in the month of April, bore this peculiar inscription: "Wish you a happy New Year. Please accept this fine old whisky from your friends in the woods."

The package arrived in Denver, April 4th. After it reached Mrs. Barnaby's hands at the Worrell residence it was placed by her in her trunk, which was locked.

On Monday, April 13th, Mrs. Worrell, Sr., and Mrs. Barnaby made a trip to the country, returning in the evening. Feeling exhausted upon their return, Mrs. Barnaby proposed to make a couple of "toddies" from the contents of this bottle. For this purpose she took it from the trunk and prepared a drink for herself and one for Mrs. Worrell, in different glasses, using about two teaspoonfuls of the contents of this bottle for each. Mrs. Barnaby drank one and Mrs. Worrell the other. Soon after drinking both were taken sick, exhibiting symptoms of arsenical poisoning. Mrs. Worrell recovered and was a witness for the state upon the trial in the district court. Mrs. Barnaby, after lingering several days in great agony, died.

An examination of the contents remaining in the bottle, by chemists of undoubted repute, disclosed a strong solution of arsenite of potassium, and arsenic was subsequently detected in the viscera of the deceased. As the decision in this court rests upon matters of law, a fuller statement of the facts is deemed unnecessary.

It was the duty of the district court trying the case to see that the trial was conducted according to law, and the jury properly instructed. It was the peculiar province of the jury

to weigh the evidence and return such a verdict as in the judgment of the jurors the evidence required.

The innocence of every accused person must be presumed until his guilt is established according to the law of the land, and beyond all reasonable doubt. The rules governing the trial of criminal cases are the outgrowth of experience, and embody the wisdom of centuries. A conviction obtained in cases where a substantial compliance with these rules has not been had cannot be allowed to stand.

Did the defendant have such a trial as the law guarantees? His counsel contend that he did not. They claim that certain well-established rules of the law of evidence were not observed at the trial, that the jury were not properly instructed, and that the defendant was greatly prejudiced thereby.

The evidence of guilt is entirely circumstantial. Of that claimed to have been improperly admitted the following may be mentioned: Mrs. E. S. Worrell, a witness for the state, was allowed to testify as follows, with reference to a conversation with the deceased, which occurred the day after she partook of the contents of the bottle:

" The next morning she seemed a little brighter. She knew she had taken poison at that time. I asked if she supposed the Bennetts could have sent that. * * * I asked her if she thought the Bennetts could have sent the stuff. She said 'No.' I asked her, 'Do you think Dr. Graves could have sent it?' and she did not answer me."

This testimony was received against objection, and after its reception the court overruled a motion to strike it out.

Mrs. Nancy B. Allen, another witness for the state, testified to a conversation had by the witness with Mrs. Barnaby, as follows: " The next morning she seemed more quiet; had become partially warm and seemed inclined to talk. Edward Worrell, Jr., came into the room and asked her how she felt, and took hold of her hand; and after he went out she says: 'How good that boy is to me; he's like my own son in his

kindness to me.   You have all been so good; if I had been at a hotel I would have died before morning.' "

This evidence was objected to, which objection was over-ruled by the court, using this language: " Everything said by her is part of the *res gestæ*, and is admissible." This witness was further permitted to testify as follows:

" She, Mrs. Barnaby, said, ' Keep this still.   I want just as quick as I am able to travel to go East.   I will put this in the hands of detectives.   I know somebody ' * * * We felt satisfied somebody was seeking her life.   I said have you any enemies that would do such a deed as this ?   She said ' I don't know that I have an enemy in the world.'   Then she thought a moment and said, ' I don't know but the last maid was angry at me ; she wasn't a lady, and I didn't care to keep her.'   I said, did you employ her, and she said she was employed by Dr. Graves.   ' He was very anxious for me to spend the winter in Cuba with this companion, and I didn't want to go ;  I wanted to go to the California coast.'   I said, ' Is there anyone you can think of who knows that they will be benefited by your death ? '   She said, ' I left Dr. Graves $50,000 in my will, and he knows it.'   I said, ' That is a good big sum.'   She said it was too much, and in a later will she had changed it.   She had two lovely daughters, she said, good girls, one traveling in Europe. She said she thought she put about two teaspoonfuls in each tumbler; that she hadn't as much confidence in Dr. Graves as she had had; that the medicine that he had sent her lately hadn't seemed to do her the good it used to; that she was not suited with the way she had been treated while she was in California; that she had been very much discommoded by not getting money when she wanted it.   At one time, she said, they had 50 cents between them."

Of this evidence it is to be observed that it consists of statements alleged to have been made by Mrs. Barnaby dur-ing her lifetime, detailed upon the witness stand by third parties.   It is mostly hearsay.   By a familiar rule of law, hearsay evidence, on account of its intrinsic weakness and

its incompetency to satisfy the mind as to the existence of any fact, and the fraud which may be practiced under its cover, is generally held inadmissible.   To this well established rule there are some exceptions, recognized from necessity, on account of the absence of better evidence.   The exceptions may be divided into four classes:

1. Evidence of matters of public and general interest.
2. Evidence of ancient possessions.
3. Declarations against interest.
4. Evidence of dying declarations.

And a few others of a miscellaneous nature.   1 Greenleaf (14 ed.) 127.

It is apparent that the statements of Mrs. Barnaby do not fall under the first three exceptions named; so their admissibility must be upheld under the fourth exception, if at all.

It is only necessary for us to state briefly the principle under which dying declarations are admitted to show that this exception does not permit the evidence here objected to. Dying declarations are admitted from the necessity of the case in order that manslayers may be brought to justice ; experience having shown that frequently no third party was an eyewitness to the homicide.   They are only admitted when it is shown that the party making them was in *extremis*, at the time, and when all hope of this world had passed ; " when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth ; a situation so solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice." *Rex v. Woodcock,* 1 Leach's Crown Law, 502.

In this case it affirmatively appears that at the time the statements were made to these two witnesses, Mrs. Barnaby expected to recover.   This of itself would exclude the application of the exception permitting evidence of dying declarations, and it is therefore unnecessary to specify other objections.   Among the miscellaneous exceptions referred

to, the one permitting evidence of the *res gestæ* is here relied upon:

" *Res gestæ* are events speaking for themselves, through the instinctive words and acts of participants, not the words and acts of participants when narrating the events. What is done or said by participants, under the immediate spur of a transaction, becomes thus part of the transaction, because it is then the transaction that thus speaks. In such cases it is not necessary to examine as witnesses the persons who, as participators in the transaction, thus instinctively spoke or acted. What they did or said is not hearsay ; it is part of the transaction itself." Wharton's Criminal Evidence (9th ed.), sec. 262.

Any statement made by Mrs. Barnaby at the time of taking the fatal dose, or so soon thereafter as to make the declarations a part of the transaction and explanatory of that act, was admissible. But with a single exception the statements are not of this character, and consequently the evidence should not have been allowed as part of the *res gestæ*. It is not only hearsay, but hearsay evidence of the most objectionable kind. Under claim that it was part of the *res gestæ*, witnesses were permitted to detail statements made by Mrs. Barnaby that would not have been receivable in evidence, if she had recovered and appeared as a witness upon the stand, against the defendant upon a charge for a lesser offense.

Under the rulings of the trial court suspicions voiced by the deceased were admitted, whether the same originated with her or emanated from some one of the numerous persons admitted to the sick chamber. In this indirect mode the statement was permitted to go to the jury that in the opinion of Mrs. Barnaby the Bennetts did not send the contents of the bottle. The court also permitted a question put by Mrs. Worrell to Mrs. Barnaby, which cast a suspicion upon Dr. Graves, although the deceased did not answer such question. In the statements detailed by Mrs. Allen, the deceased was also allowed to reflect upon the character of a witness

for the defense, Sallie Hanley, and thus in advance prejudice her evidence before the jury.

Suspicion was permitted to be cast upon the defendant by the introduction of declarations of the deceased, tending to show that this maid was employed for her by Dr. Graves under circumstances which would indicate that such employment was not only without her consent, but against her wishes and for a sinister purpose. So, also, in this indirect way the statement was introduced to the jury that she had left Dr. Graves $50,000 by a former will, and that he knew of it, although by other evidence it is conclusively shown that this statement was not in accordance with the fact, and at best it is a narrative of a past transaction in no way connected with the taking of the poison, and therefore not admissible.

It is contended that this evidence was competent to show that Mrs. Barnaby's confidence in plaintiff in error had been shaken, and that she had lost regard for him. The statements having been made after the alleged crime had been committed they were incompetent for this purpose; aside from this, as we have seen, the evidence was not properly limited. Statements purporting to have emanated from the deceased during her last sickness, at a time when her body was racked with suffering, were well calculated to unduly prejudice the defendant's cause with the jury.

A large part of the evidence of the witness Addie A. Carrier, is still more harmful and equally as objectionable as the evidence of either Mrs. Worrell or Mrs. Allen. This witness testified in part as follows:

"Tuesday morning I had a conversation with Mrs. Barnaby. She seemed to want to talk. I sat down by the side of the bed and the first thing she said was, 'Somebody evidently wants to kill me.' I said, 'It looks that way.' She said, 'Keep still about it, because whoever sent that bottle sent it with the intention of taking my life, and is watching the result. Just as soon as I am able I shall take the bottle and put it in the hands of the best criminal lawyer I can find

in New York city, and ferret this out, if it takes every dollar I have.' I was there perhaps two hours. * * * I went in almost every day, but didn't have any special conversation with her until Friday morning before her death. That morning it was very hard work for her to breathe. She felt very sick. I asked her, 'Do you think the Bennetts sent that dose?' She says, 'Oh, no, no; we are the best of friends. I am going to spend the summer with them.' Then she says: 'Can it be possible Dr. Graves would do such a thing?' I says, 'I don't know; did you remember him in your first will to a large amount?' She said, 'Yes, $50,000,' and that he knew it; that he saw the will. My mother told me that Mrs. Barnaby had informed her to the same effect."

Although the evidence of this witness was not objected to at the time, in view of a new trial of the cause, we deem it incumbent upon this court to notice it. After the previous ruling of the trial court, admitting against objection the same character of evidence from other witnesses and the declaration that "everything said by her (Mrs. Barnaby) at the time is part of the *res gestæ* and is admissible," the failure of the counsel to renew the objections to evidence of Mrs. Barnaby's statements should not cause wonder. *Gilpin v. Gilpin,* 12 Colo. 504.

A constant repetition of the same objection would have unnecessarily delayed the trial and might have prejudiced the defendant's cause before the jury. When a certain class of evidence is offered, such objection as counsel have to its admission should be fully stated. After this has been done and the objection argued, overruled, and the evidence received, the attention of the court again called to its objectionable character by a motion to strike out the evidence, and exceptions to the adverse rulings duly taken, as in this case, counsel may well desist from renewing fruitless objections.

The representations made by Mrs. Barnaby, while sick, of the nature, symptoms and effects of her sickness, were properly admitted as original evidence, but the rule permitting

this requires the evidence to be limited to exclamations of present pains, or statements of present symptoms, and other like matter.

Error is also assigned upon the ruling of the court whereby two certain receipts were excluded.

These were given by C. M. Van Slack to Dr. Graves, for property turned over by the latter to the former. It was in evidence on the part of the state that Van Slack had been appointed by the proper court custodian of the property after Mrs. Barnaby's death, and that stocks and money had been turned over to him as such custodian by Dr. Graves. The defendant testified that Van Slack had receipted for this property, and offered in evidence such receipts, but the court excluded the same as immaterial. The receipts as they appear in the record embrace an itemized list of a large amount of personal property said to have belonged to Mrs. Barnaby. The court was in error in declaring these receipts immaterial. The state having been allowed to prove every item of property belonging to Mrs. Barnaby, traceable to the hands of the defendant, he in turn should have been permitted to show the items turned over by him to the proper custodian, and these receipts were competent evidence for this purpose, and should have been admitted as tending to disprove one motive ascribed for the commission of the crime. By their exclusion the jury was left uninformed as to the particular nature of the property described therein.

It was likewise an error to exclude the evidence offered by plaintiff in error, tending to show that his office in Providence had been surreptitiously entered during his absence and his accounts destroyed or carried away. He was entitled to have this evidence considered by the jury in connection with the charge that he had squandered the estate and had preserved no sufficient record of his transactions in connection therewith. As to whether such evidence was entitled to much or little weight, it was for the jury and not the court to determine.

Error is assigned upon the following instruction given to the jury trying the cause:

" 7. The court instructs you that the law requiring you to be satisfied of the defendant's guilt beyond a reasonable doubt, in order to warrant a conviction, does not require that you should be satisfied beyond a reasonable doubt of each link in the chain of circumstances relied upon to establish the defendant's guilt. It is sufficient if, taking the testimony altogether, you are satisfied beyond a reasonable doubt that the defendant is guilty."

This instruction appears in Sackett's Instructions to Juries, p. 647. In support of the instruction the author cites the following cases: *Houser v. The State*, 58 Ga. 78 ; *Jarrell v. The State*, 58 Ind. 293 ; *State v. Hayden*, 45 Ia. 11 ; *Bressler v. The People*, 117 Ill. 422.

In *Houser v. The State, supra*, the indictment charged the defendant with the crime of burglary, and the instruction which was sustained upon appeal is in this language :

" The state must make out the case beyond a reasonable doubt, but that it is not necessary for the state to show that it is impossible for the crime to have been committed by anybody else, or that it might not, by bare possibility, have been done by some one else."

This instruction is so unlike the one under review that the indorsement of the former by the Georgia court cannot be considered as any authority in support of the instruction of which complaint is here made.

So, also, in the case of *Jarrell v. The State, supra*, the instruction approved is entirely dissimilar from that given in this case. The indictment in that case charged the defendant with an assault with intent to murder. The evidence of the crime charged was direct; no charge was given upon circumstantial evidence. The court instructed the jury that, " evidence is sufficient to remove reasonable doubt, when it is sufficient to convince the judgment of ordinarily prudent men of the truth of a proposition, with such force that they would act upon that conviction, without hesitation in their

own most important affairs." This instruction states the law correctly, but why it should be cited in support of the text is not apparent.

In *State v. Hayden, supra,* the following instruction was asked by defendant and refused: " * * * As the evidence in the case is wholly circumstantial, you must be satisfied beyond a reasonable doubt of each necessary link in the chain of circumstances to establish the defendant's guilt."

The jury were, however, instructed as follows :—" The defendant is presumed to be innocent of the crime charged until proved guilty beyond a reasonable doubt, and as the evidence in this case is circumstantial, it is your duty to give all the circumstances a careful and conscientious consideration, and if upon such consideration the minds of the jury are not firmly and abidingly satisfied of the defendant's guilt, if the conscientious judgment of the jurors waivers and oscillates, then the doubt of the defendant's guilt is reasonable and you should acquit." Certainly the instruction there given was as favorable to the defendant as the law would permit, and as we shall show hereafter the instruction refused was properly refused, as the metaphor of a chain of circumstances is inaccurate and calculated rather to mislead than to enlighten a jury, and ought never to be used in an instruction. The only case cited, and the only one which we have been able to find, in which the giving of an instruction like the one under considernation has been held not to constitute reversible error, is the case of *Bressler v. The People, supra.* Bressler was indicted for the larceny of a promissory note. The state claimed that the note was stolen from a justice of the peace by the name of Smith, who held it with other notes' for collection. Direct proof was introduced, showing that the defendant obtained the note from Smith, the only question being as to the manner by which he acquired possession thereof. The defendant testified that he paid the note, and that Smith thereupon voluntarily delivered it to him. Smith, in his testimony denied that the note had been paid and that he had voluntarily delivered it to the defendant. He said,

the defendant took the note against his consent and without his knowledge. It will be noticed that the testimony of neither of these witnesses can be classed under the head of circumstantial evidence. It was apparent that one witness testified truthfully and the other falsely. Circumstances were, then introduced in support of the testimony of each, this latter evidence being all the evidence there was in the case to which the jury could have applied the instruction. Under these circumstances the court held that the instruction did not warrant a reversal of the judgment. As we understand the opinion, it holds simply that under the peculiar circumstances of that case the judgment would not be interfered with, although the instruction is not commended as a model. It is said that the metaphor of a chain and links could only be applied where there is a series of facts, one succeeding another and each connected with and depending upon the other, and the evidence in the case under consideration was not of that character.

From the foregoing it will be seen that the cases cited to uphold this instruction either do not support the same, or do so in a qualified manner. We are not, however, without direct authority upon the erroneous nature of the instruction, the identical language here under consideration having been before the supreme court of Nebraska in the case of *Marion v. The State*, 16 Neb. 349. The court in that case condemned the instruction and said that it did not state the law correctly. The judgment was reversed for other reasons, and it does not appear with certainty whether or not it would have been reversed solely by reason of this instruction. The opinion, however, strongly condemns the language of the instruction and declares that it should not have been given.

In the case of *Leonard v. Washington Territory*, 2 Wash. Ty. Reports, 381, the instruction was under review by the supreme court of that territory. The court held that the giving of this instruction was error, stating that the metaphor was inaccurate and misleading; that a guilty person is more commonly hemmed in by a throng of circumstances than in-

closed by the facts arranged chainwise; the fault of the instruction being in its tendency to lead the jury to regard all the facts as displayed in a chain, every link of which, if such were the case, would have to be proved beyond a reasonable doubt.

We also have authority upon the question under consideration in our own state. In *Clare et al. v. The People,* 9 Colo. 122, it received the condemnation of this court in language that does not admit of misconstruction. The opinion as prepared by Mr. Justice Helm will be found a clear and able exposition of the law. The learned judge, in the course of the opinion, says of this instruction:

" The proposition which the court doubtless intended to announce is that it was not necessary for the state to have proven beyond a reasonable doubt every circumstance offered in evidence, and tending to establish the ultimate facts or circumstances on which a conviction depended. This would have been, in our judgment, good law. But while such was the purpose which the court sought to accomplish, it is exceedingly doubtful if the language employed did not mislead the jury. The metaphor used is inaccurate, and liable to misconstruction. It is incorrect to speak of a body of circumstantial evidence as a chain and allude to the different circumstances as the links constituting such chain, for a chain cannot be stronger than its weakest link, and if one link fails the chain is broken. . . . The evidence in cases similar to the one before us has been more aptly likened to a cable. One, two or a half dozen strands may part, yet the cable still remain so strong that there is scarcely a possibility of its breaking." The judgment was reversed solely for error in the charge in this respect.

These are all the cases that we have been able to find in which this instruction has been under consideration by the higher courts. An examination of the cases discloses that in no instance has the instruction been commended as a model of accuracy, and in several it has been unequalifiedly condemned. Upon principle, we think the instruction should

be condemned, its tendency being to confuse the jury. The jury are quite as likely to have applied that portion of the instruction referring to the links to those facts which the law requires to be established beyond a reasonable doubt to warrant conviction, as to those evidentiary matters which go to prove such facts, and one or more of which may fail, while the ultimate fact might still be sufficiently established. Counsel for the state claim that this instruction was cured by others given by the court, but a careful examination of the entire charge fails to show that the evil which might have been, and probably was, worked by this instruction was elsewhere cured. When an erroneous instruction is given, it must be shown that it did not work harm to the defendant; otherwise, the judgment cannot be allowed to stand. This is not shown in this case. The instruction having received the unqualified disapproval of this court in the case of *Clare v. The People, supra*, should not have been given.

Evidence of statements alleged to have been made by Mrs. Barnaby, by tending to show loss of confidence on her part in Dr. Graves, and an intention to change the management of her affairs, was incompetent to show a motive for the commission of the crime, unless such statements were brought to his knowledge prior to the time at which it is claimed that the bottle was sent. And the jury should have been instructed to disregard all such evidence, unless satisfied from the whole evidence in the case that Dr. Graves had such knowledge at that time. The fifteenth instruction given was intended to cover this point, but we are of the opinion that it does not contain the necessary limitation, as above stated.

We deem it unnecessary to discuss other errors assigned. But the argument of counsel for the state urging this court to allow the judgment of the district court to stand, notwithstanding the manifest errors in this record, demands a word of reply in concluding this opinion.

In all criminal prosecutions the law of the land guarantees to every accused person a fair trial and a right to meet the witnesses against him face to face. This plaintiff in error

has not had such a trial. Suspicions and statements of the deceased not even having the sanction of her oath were put in evidence against him by third parties, in violation of fundamental principles. Take away anyone of these guarantees and a precedent would be established which, if followed to its legitimate end, would lead to arbitrary punishment, which is inconsistent with our institutions and utterly incompatible with the safety of the citizen.

It is conceded that not every error occurring upon a trial will warrant a reversal. If it be shown that a substantial compliance with the law has been had, even a capital sentence may be allowed to stand; but in this case the jury were allowed to consider evidence on the one hand of a character that has been universally condemned as improper, evidence violative of fundamental and long established principles, while on the other evidence was excluded which the defendant had an undoubted right to have considered. The error in this regard being aggravated by error in the charge to the jury, prejudicial to the rights of the accused, the duty of this court to set aside the conviction is plain. The judgment will be accordingly reversed and the cause remanded.

*Reversed.*